**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Criminal Case No. 25 - 115 (SLS) |
| v. | Judge Sparkle L. Sooknanan |
| DAMARQUS MOORE, | |
| *Defendant*. | |

**<u>MEMORANDUM OPINION</u>**

This case involves a series of troubling decisions by law enforcement that led to the criminal prosecution of Damarqus Moore. In January 2025, Mr. Moore was doing something that thousands of District residents do every day—sitting in a stationary car on the side of the road. There is no indication that he was causing a disturbance or otherwise taking actions that would warrant the attention of law enforcement. Yet seemingly out of nowhere, six armed officers from a D.C. Metropolitan Police Crime Suppression Unit surrounded the vehicle. As the Government tells it, the six officers converged on Mr. Moore because they noticed that the vehicle was idling with its lights on. Although idling in a private vehicle is *not* a crime in the District, these officers believed otherwise and approached Mr. Moore because of this innocent conduct. As the officers approached, they also observed that the car's windshield was heavily tinted and that it was missing a front license plate.

One officer knocked on the window. Mr. Moore, understandably confused at the sight of six police officers surrounding him, voluntarily stepped out of the car and calmly asked them what was going on. They told him about the tint and missing license plate. The officers then ran the number for the rear plate, and they found that it was registered to a different vehicle. They placed

Mr. Moore under arrest for "misuse of tags" and proceeded to search the entire passenger compartment—purportedly for further evidence of that offense. The officers began by looking in places you might expect to find registration papers, like the glove compartment and the center console. But they did not stop there. They checked under the seats, in seat back pockets, underneath clothes, food wrappers, and other items that were in the seats and footwells. They looked under and behind a child car seat. They even picked up a coffee cup to purportedly check if registration papers were somehow tucked in the cupholder. They found no evidence to further support "misuse of tags" or to suggest that Mr. Moore was engaged in any other criminal behavior.

The officers were not deterred. They then searched Mr. Moore himself and found a small baggie with eight pills that they believed were the controlled substance MDMA in one of his jacket pockets. Emboldened by this discovery, the officers began another search of the vehicle. They looked in the same places they had looked before. And this time around, their persistence paid off. They found a gun, wedged in a gap under the steering wheel. The Government indicted Mr. Moore as a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Mr. Moore moved to suppress the firearm found in the vehicle as the product of several Fourth Amendment violations. The Court held an evidentiary hearing where one of the officers testified. His testimony was illuminating in several respects. For one thing, on cross-examination, the officer learned for the first time that idling—the reason that law enforcement approached Mr. Moore in the first place—is not actually a crime in the District for private passenger vehicles. (The Court is left to wonder how many District residents have been charged with the crime of idling by this officer and other members of his team.) For another, the officer appeared to agree that the search for evidence of the "misuse of tags" crime was too broad, telling the Court that he would not look for registration papers in cupholders. In the end, the Government's sole witness

did not advance its case. Based on a thorough review of the evidence, including the body-worn camera footage admitted into evidence, the Court concludes that the officers violated the Fourth Amendment during their interactions with Mr. Moore. As a result, the Court must suppress the firearm recovered during the last search. The Court grants Mr. Moore's motion.

<b>BACKGROUND</b>

### A. Factual Background

The Court makes the following factual findings based on the Parties' submissions, including their briefs, the body-worn camera footage, and other attached exhibits, as well as witness testimony from an evidentiary hearing held after briefing.[1]

On January 13, 2025, at around 4:55 p.m., Mr. Moore was sitting in the driver's seat of a black BMW sedan on the side of a street in Northeast Washington, D.C., when six officers from a D.C. Metropolitan Police Crime Suppression Unit surrounded the vehicle. Suppl. Gerstein, ECF No. 13-1; Tr. 12:24–13:4, 20:6–12, ECF No. 35; Suarez BWC 16:54:40–55:04; Moore BWC 16:54:57–55:15; Schemmel BWC 16:55:08–12. The officers converged on the black BMW sedan in three separate police vehicles and effectively boxed the sedan in. Suarez BWC 16:54:40–55:04; Moore BWC 16:54:57–55:15; Schemmel BWC 16:55:08–12; *see also* Tr. 64:6–65:6. One police vehicle parked diagonally behind Mr. Moore facing the opposite direction as the BMW. Schemmel BWC 16:55:08–12; Moore BWC 16:54:57–55:10; *see also* Tr. 64:13–15. A second vehicle parked in front of Mr. Moore (also facing the opposite direction). Suarez BWC 16:54:48–58; Schemmel BWC 16:55:07–11; Moore BWC 16:54:57–55:10; *see also* Tr. 64:6–7. And the third was across

---

[1] The Court relies on the body-worn camera footage for Officers Eddy Suarez, Thomas Schemmel, and Carter Moore, which were admitted into evidence at the evidentiary hearing. *See* Gov. Ex. List, ECF No. 29; Def. Ex. List, ECF No. 30.

3

the street. Suarez BWC 16:55:03–06; Schemmel BWC 16:55:09–12; Moore BWC 16:54:56–55:12; *see also* Tr. 64:21–25.

As the officers approached the black BMW, Mr. Moore stepped out of the vehicle and asked what was going on. Suarez BWC 16:55:00–11; Schemmel BWC 16:55:08–11; Moore BWC 16:54:58–55:11. The officers can be heard on the body-worn camera footage explaining to Mr. Moore that they stopped him because the front windshield on his vehicle had "extremely dark" tint and they could not see inside. Suarez BWC 16:55:00–11; Moore BWC 16:54:58–55:11; *see also* Tr. 65:7–20. But the vehicle's windshield tint is not the reason that the officers approached Mr. Moore in the first place. Officer Suarez testified that what initially drew the officers' attention to the black BMW was a report by Officer Schemmel that the vehicle was "idling," Tr. 13:22–24, 58:5–10; *see also* Suppl. Gerstein 1, and, according to Officer Suarez, "a vehicle idling in the District of Columbia is subject to being cit[ed] with a ticket." Tr. 15:3–4. On cross-examination, Officer Suarez acknowledged that his understanding of the law was incorrect; in fact, idling is a citable infraction only for commercial vehicles, not private passenger vehicles. Tr. 60:21–61:4; *see* 18 DCMR § 2418.3.

For his part, Officer Schemmel offered other explanations for the stop. At the time of the stop, he told Mr. Moore that his vehicle had "no front tag." Schemmel BWC 16:56:00–08; Moore BWC 16:56:00–08. And the probable cause report written after Mr. Moore's arrest stated that Officer Schemmel saw "through the front windshield that Defendant Moore was erratically moving around in the driver seat of the vehicle." Suppl. Gerstein 1. The Court does not credit this assertion, which is directly contradicted by the officers' statements that they could not see through the "extremely dark" tint. *See, e.g.*, Suarez BWC 16:55:00–11 (Officer Johnson saying to Mr. Moore "we couldn't see inside your car"); *see also* Tr. 20:9–12, 65:7–20. It is also inconsistent

4

with the body-worn camera footage showing that it was difficult to see anything through the vehicle's tinted windshield. *See, e.g.*, Schemmel BWC 16:55:08–27 (showing how difficult it is to see through the front windshield from distance); Moore BWC 16:54:57–55:05 (same); Suarez BWC 16:54:46– 57 (same for rear windshield and side windows).

When Mr. Moore stepped out of the BMW, Officer Suarez asked him to move towards the back of the vehicle, and as he guided Mr. Moore in that direction, he also radioed the license plate number of the BMW to Sergeant Hiller, who was sitting in the car across the street. Suarez BWC 16:55:13–46; Schemmel BWC 16:55:13–36; Moore BWC 16:55:13–36. Roughly ten seconds later, Sergeant Hiller responded that the plate was registered to a Nissan Sentra, not a BMW. Tr. 24:13–20; *see also* Suarez BWC 16:55:42–46. Almost immediately, the officers who had been frisking Mr. Moore placed him in handcuffs. Suarez BWC 16:55:45–55; Schemmel BWC 16:55:45–55; Moore BWC 16:55:50–58.

Shortly after that, Officer Suarez confirmed with Sergeant Hiller that Mr. Moore was being arrested for "misuse of tags." Suarez BWC 16:56:39–48; Tr. 27:8–11, 32:4–20. But the officers did not tell Mr. Moore that he was being arrested. Tr. 28:5–10, 34:24–35:3. Instead, when he asked them why he was being placed in handcuffs, they assured him that the handcuffs could be taken off "as easy" as they had been put on, that they were "trying to figure something out," and that they were looking for the registration for the vehicle. Suarez BWC 16:55:50–56:35; Schemmel BWC 16:55:50–56:35. Mr. Moore told them that the vehicle was not his, and he conveyed his confusion about why they had stopped him in the first place as the car was not even on at that point.[2] Suarez BWC 16:56:11–35; Schemmel BWC 16:56:07–35; Moore BWC 16:56:07–19.

---

[2] The officers confirmed a few minutes later that the vehicle had not been reported stolen. Suarez BWC 16:59:24–32; Tr. 39:17–40:1. Mr. Moore has since provided a letter from the owner of the BMW explaining that he gave Mr. Moore permission to use it. ECF No. 34-1.

Officer Suarez testified at the evidentiary hearing that he chose not to inform Mr. Moore of his arrest as a "de-escalation measure"—because when you "tell somebody they are under arrest they might get . . . very hostile and rowdy." Tr. 28:7-10; *see also id.* 29:8-9 ("To avoid any hostility, we wait until the last possible second to advise [individuals that they are being placed under arrest]."). But up until that point and throughout the remainder of the interaction, Mr. Moore was entirely cooperative and compliant with officer directions, something Officer Suarez acknowledged in his testimony. Tr. 67:17–20; *see also generally* Suarez BWC. And Officer Suarez testified that his "de-escalation tactic" is not something he was trained on but "something [he] picked up working." Tr. 101:1–8.

Around the same time that Mr. Moore was being handcuffed, the body-worn camera footage shows that officers were looking inside the vehicle—and that they had started looking the moment that Mr. Moore stepped out. They looked through the open driver's side door and shined flashlights through the tinted windows. Suarez BWC 16:55:00–47; Schemmel BWC 16:55:09–49; Moore BWC 16:55:15–56:42. Officer Moore, who was looking through the driver's side door, claims that he observed a glass container on the front passenger seat that contained green liquid that he thought might be PCP. Moore BWC 16:55:30–56:29; Suarez BWC 16:56:52–57:25; Schemmel BWC 16:56:52–57:02. He asked Officer Suarez to unlock the front passenger door, and Officer Suarez did so by leaning fully into the vehicle to reach the door lock controls on the center console. Suarez BWC 16:55:54–56:11; Moore BWC 16:55:53–56:14; *see also* Tr. 71:5–72:12. After opening the passenger door and looking more closely, Officer Moore determined that the glass container was just a bottle of cologne. Suarez BWC 16:56:53–57:26; Schemmel BWC 16:56:54–57:03; Moore BWC 16:56:11–57:26; *see also* Tr. 73:21–74:5.

After the officers discovered a potential "misuse of tags" violation, they began a much more comprehensive search of the BMW; according to them, for documentation related to that offense. Suarez BWC 16:58:24–31; Schemmel BWC 16:58:24–31; *see also* Tr. 77:2–7. Officers Suarez, Schemmel, and Moore primarily conducted that search, which took about ten minutes. *See generally* All BWCs 16:59:31–17:08:57. The officers began by opening the doors of the vehicle and taking pictures. Suarez BWC 16:57:12–21; Moore BWC 16:57:11–22; Tr. 34:10–16. They then transitioned to physically searching the vehicle's interior. Suarez BWC 17:00:13; Schemmel BWC 17:00:23; Moore BWC 17:00:13. At first, they focused on areas where one might logically expect to find paperwork related to a vehicle's registration, including the glove box and center console. Suarez BWC 17:00:16–01:48; Moore BWC 17:00:40–54; *see also* Tr. 42:23–43:5. When they found no relevant evidence in those locations, they quickly expanded their search. They looked under the seats, in the seatback pockets, in side-door compartments, and even behind and underneath a child car seat. Suarez BWC 17:01:16–21, 54–02:34; Schemmel BWC 17:01:33–02:56, 07:20–44; Moore BWC 17:00:23–34, 01:08–37; *see also* Tr. 45:22–46:5. They sifted through various items on the seats and in the footwells including clothing, wrappers, and other miscellany. Schemmel BWC 17:03:06–40, 04:14–05:12, 07:09–08:22; Moore BWC 17:01:37–03:31. At one point, Officer Schemmel even picked up a Starbucks coffee cup in the center console to apparently see if there might be documentation in the cupholder under the cup. Schemmel BWC 17:06:25–40; *see also* Tr. 87:18–20. The officers also searched many parts of the vehicle more than once, frequently retracing each other's steps. *See, e.g.*, Suarez BWC 17:01:56–02:20 and Schemmel BWC 17:07:20–44 (showing Officers Suarez and Schemmel searching the passenger-side seatback pocket in succession); Moore BWC 17:01:45–02:24 and Schemmel BWC 17:08:40–55 (showing Officers Moore and Schemmel searching through items

7

on the back seat in succession); Suarez BWC 17:00:18–01:02 and Schemmel BWC 17:04:20–35 (showing Officers Suarez and Schemmel searching the glove compartment in succession). Despite the thoroughness of their search, the officers found nothing of evidentiary value pertaining to misuse of tags. Tr. 17:23–24. Nor did they find any other evidence of criminal activity.

With their search of the vehicle complete, the officers finally informed Mr. Moore that they were arresting him for misuse of tags and began to search his person. Tr. 17:23–25; Suarez BWC 17:07:25–12:09. In one of Mr. Moore's jacket pockets, Officer Suarez found a small baggie with eight pills that the officers believed were the controlled substance MDMA. Suarez BWC 17:08:30–40; Moore BWC 17:08:30–55. Based on this discovery, they began yet another search of the car looking for "additional evidence of Narcotic Possession." Suppl. Gerstein 1. About three minutes into that second search, Officer Schemmel found a firearm wedged into a gap under the steering wheel in the driver's seat area. Schemmel BWC 17:11:39–50; Moore BWC 17:11:39–45; *see also* Tr. 54:6–55:13.

### B. Procedural Background

On April 23, 2025, the Government charged Mr. Moore by indictment with one count of Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1). ECF No. 1. On November 3, 2025, Mr. Moore moved under the Fourth Amendment to suppress the evidence found in the black BMW on the day of his arrest. Mot. Suppress, ECF No. 13. After the Parties fully briefed that motion, Gov. Opp'n, ECF No. 18; Reply, ECF No. 20, the Court scheduled an evidentiary hearing for April 23, 2026. *See* Min. Order (Jan. 29, 2026).

Three days before that hearing—and more than three months after briefing on Mr. Moore's motion closed—the Government filed a Motion Opposing Mr. Moore's Request for Suppression

and Evidentiary Hearing. ECF No. 25. In its motion, the Government argued for the first time that Mr. Moore did not have standing to challenge the searches of the BMW because he had no legitimate possessory interest in the car. *Id.* at 1–2. Upon receiving the motion, the Court ordered the Government to explain why it had not made this argument sooner. The Government reported that it had only identified the argument when preparing for the hearing—in other words, it wanted another shot at briefing after its deadline had passed. ECF No. 26. With the hearing only three days away, the Court had to order Mr. Moore to file any response to the Government's motion on an expedited basis. *See* Min. Order (Apr. 20, 2026). Mr. Moore, unlike the Government, complied with the Court's deadline. ECF No. 27.

At the evidentiary hearing, the Court heard testimony from Officer Suarez. The Government also agreed to withdraw its procedurally improper Motion Opposing Mr. Moore's Request for Suppression and Evidentiary Hearing, ECF No. 25. Tr. 7:23–9:9; *see also* Notice to Withdraw Motion, ECF No. 31. At the end of the hearing, however, the Government's belated arguments continued when it began making arguments that it had not raised in its briefing, including arguments about the lack of a "causal connection" between the alleged Fourth Amendment violations and the discovered firearm. Tr. 114:3–23; 116:23–117:1. The Court told the Government that it would not entertain those new arguments at the hearing and ordered the Government to explain why those arguments were not forfeited. *Id.* 117:2–7; *see also* Min. Order (Apr. 23, 2026). The Government has since filed its supplemental brief addressing that question, and Mr. Moore has responded. ECF Nos. 33, 34.

## LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Evidence obtained in violation of this guarantee is generally suppressed according to the

9

'exclusionary rule.'" *United States v. Darwah*, No. 25-cr-194, 2026 WL 145612, at *4 (D.D.C. Jan. 20, 2026) (quoting *United States v. Weaver*, 808 F.3d 26, 33 (D.C. Cir. 2015)). This includes evidence that is the "direct result" or "derivative" of the "illegal search or seizure"—the "so-called fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (quotation marks omitted).

Searches conducted without a judicially authorized warrant "are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). One exception relevant here is "a search incident to a lawful arrest." *Id.* Another is the "automobile exception," which permits police to search a car if it "is readily mobile and probable cause exists to believe it contains contraband." *United States v. Williams*, 773 F.3d 98, 105 (D.C. Cir. 2014).

Importantly, when officers conduct a warrantless search, "the government carries the burden" of showing that one of the exceptions applies. *Darwah*, 2026 WL 145612, at *5 (quoting *United States v. Singleton*, 759 F.2d 176, 181 (D.C. Cir. 1985)); *see also Chimel v. California*, 395 U.S. 752, 762 (1969) ("[T]he general requirement that a search warrant be obtained is not lightly to be dispensed with, and the burden is on those seeking (an) exemption (from the requirement) to show the need for it." (quotation omitted)).

## DISCUSSION

Mr. Moore contends that his interactions with law enforcement involved a series of Fourth Amendment violations—beginning with his initial seizure and ending with the discovery of the firearm. First, he argues that his initial seizure and handcuffing exceeded the scope of a permissible *Terry* stop to investigate the alleged traffic infractions. Second, he contends that the officers conducted several unlawful searches of the vehicle before they found the MDMA in his jacket pocket, including the search for evidence of Mr. Moore's alleged misuse of tags. And third, he

asserts that the officers' discovery of the MDMA did not justify an additional search of the vehicle. Mr. Moore argues that these Fourth Amendment violations created a tainted chain of events that led to the discovery of the firearm, requiring its suppression.

The Court agrees that suppression of the firearm is warranted. Although the officers' initial interaction with Mr. Moore raises concerns, the Court need not decide whether the officers violated the Fourth Amendment when they initially seized and arrested Mr. Moore. That is because the officers' search of the vehicle for documentation related to misuse of tags was unreasonably broad and violated the Fourth Amendment. And the officers' subsequent search that resulted in the discovery of the firearm independently violated the Fourth Amendment because it was not supported by a reasonable belief that the vehicle contained additional narcotics. Accordingly, the Court grants Mr. Moore's motion and suppresses the firearm discovered in the vehicle.

### A.    Standing

Before addressing the alleged Fourth Amendment violations, the Court begins with the Government's argument that Mr. Moore lacks standing to challenge the officers' searches of the BMW. According to the Government, he has not established a legitimate possessory interest in the vehicle that would support a reasonable expectation of privacy. Gov't Suppl. Br. 5–6. Standing under the Fourth Amendment "is not a jurisdictional question and hence need not be addressed before addressing other aspects of the merits of a Fourth Amendment claim." *Byrd v. United States*, 584 U.S. 395, 410–11 (2018). But the concept of standing "can be a useful shorthand for capturing the idea that a person" asserting a Fourth Amendment violation must show that they had "a cognizable Fourth Amendment interest" that was invaded. *Id.* So the Court will address it first.

As an initial matter, the Government may well have forfeited this argument by not making it until three days before the evidentiary hearing (and more than three months after briefing was

complete). The Government appears to believe that it is held to a different standard than other parties—*i.e.*, that unlike other parties, it may raise new arguments after the close of briefing simply because it did not do a thorough enough job briefing the issues the first time. This Court declines to provide unusually lenient treatment in a criminal case in which the Government is seeking to deprive someone of their liberty. The Court holds the Government to the same standard as all parties appearing before it. But even if the Government did not forfeit the argument, it is easily dispensed with.

The Supreme Court has held that "someone in otherwise lawful possession and control" of a vehicle "has a reasonable expectation of privacy in it" even if they are not the owner of that vehicle. *Byrd*, 584 U.S. at 398–99. While *Byrd* concerned the driver of a rental car and held that such a driver may have a reasonable expectation of privacy in the vehicle "even if the rental agreement does not list him or her as an authorized driver," *id*., the Court saw "no reason why the expectation of privacy that comes from lawful possession and control and the attendant right to exclude would differ depending on whether the car in question is rented or privately owned by someone other than the person in current possession of it," *id*. at 407. Here, Mr. Moore has produced evidence that he had lawful permission to use the vehicle in question, ECF No. 34-1—evidence that the Government did not even attempt to rebut. He thus had a cognizable Fourth Amendment interest in the vehicle that he may allege was unlawfully invaded when officers seized him and searched the vehicle.

### B.    Exceptions Permitting Vehicle Searches

The Court now turns to the heart of the matter: the legality of the vehicle searches. The Government does not dispute that the contested searches were conducted without a warrant. Instead, it maintains that the searches were justified under two exceptions to the warrant

requirement: (1) as searches incident to Mr. Moore's arrest, and (2) as searches permitted by the "automobile exception." Opp'n 8–11. It is, of course, the Government's burden to establish that these exceptions apply. *Chimel*, 395 U.S. at 762. The Government has not met its burden.

### 1.    Vehicle Searches Incident to Arrest

Under longstanding Supreme Court precedent, officers may search a vehicle incident to arrest in only two circumstances. *Gant*, 556 U.S. at 351. First, "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id.* at 343. Or second, "when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Id.* (quoting *Thorton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring)). The Government does not appear to argue that this case presents the first circumstance. Nor would such an argument be persuasive given that Mr. Moore was handcuffed at the rear of the vehicle when the officers searched it.

This case thus turns on whether it was reasonable for the officers to believe that they would find evidence of the relevant crimes in the vehicle. The D.C. Circuit has held that the "reasonable to believe" standard set forth in *Gant* "probably is akin to the 'reasonable suspicion' standard required to justify a *Terry* search." *United States v. Vinton*, 594 F.3d 14, 25 (D.C. Cir. 2010). That standard, while less than probable cause, cannot be satisfied by "a mere hunch." *Id.* (cleaned up). It requires that an officer be able "to point to *specific* and *articulable* facts which, taken together with rational inferences from those facts, support a reasonable and articulable suspicion" that there will be relevant evidence in the vehicle. *See Darwah*, 2026 WL 145612, at *8 (quoting *United States v. Delaney*, 955 F.3d 1077, 1081 (D.C. Cir. 2020)). In making this determination, courts consider "the totality of circumstances as viewed through the eyes of a reasonable and cautious

13

police officer on the scene, guided by his experience and training." *Id.* at *10 (quoting *United States v. Bailey*, 622 F.3d 1, 6 (D.C. Cir. 2010)).

Even if reasonable suspicion justifies the search of a vehicle for offense-related evidence, there is an open question about the limitations on the scope of the search. Although there is no binding precedent addressing the question, *see* Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* § 7.1(d) (6th ed. 2025) (discussing how *Gant* and subsequent jurisprudence have not clearly defined the permissible scope of searches for offense-related evidence), the Court is of the view that such searches cannot be unlimited. In the closely adjacent context of the "automobile exception," for example, the Supreme Court has said that the scope of a warrantless vehicle search must be "defined by the object of the search and the places in which there is probable cause to believe that it may be found." *United States v. Ross*, 456 U.S. 798, 824 (1982) ("Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase."). The Court can think of no reason why that rationale would not hold true for a search of a vehicle for offense-related evidence incident to arrest—the principal difference being the lesser standard of reasonable suspicion. Indeed, the Government seems to acknowledge as much in its Opposition when it suggests that the search for documentation in the BMW was reasonable in part because it "was strictly limited to the areas where such documents might be found." Opp'n 9.

With these principles in mind, the Court assesses the bases and scope of the two vehicle searches incident to arrest in this case: the first for documentation related to misuse of tags and the second for additional evidence of narcotics possession.

14

*Search for Documentation*. Mr. Moore challenges both the basis and scope of the search for documentation. First, he argues that the officers had an insufficient basis to search the vehicle. He contends that it was unreasonable for the officers to search the vehicle for further evidence of misuse of tags because Sergeant Hiller's confirmation that the tag on the BMW was registered to a different vehicle was "all [the] evidence they needed." Reply 7. Second, Mr. Moore asserts that even if a limited search for documentation was justified, the officers' actual search far exceeded the scope of what was reasonable. Reply 8. The Court agrees with Mr. Moore's second argument but not his first.

Starting with the basis for the search, the Government asserts that Mr. Moore's statement that "he was not the owner of the BMW" gave the officers reason to search for documents clarifying the ownership status of the vehicle. This is persuasive. Under different circumstances, the Court might agree that the crime of "misuse of tags" is akin to the traffic violations discussed in *Gant* for which "there will be no reasonable basis to believe the vehicle contains relevant evidence." *Gant*, 556 U.S. at 343. Here, however, Mr. Moore's denial of ownership of the BMW provided a reasonable basis for the officers to look for further evidence of the offense. The relevant regulatory provision for misuse of tags is 18 DCMR § 1104.4. That provision states, among other things, that a "person shall not be liable" for misusing a "vehicle identification tag" if they were "under the good faith belief" that the tag was the "genuine" item—*i.e.*, attached to the vehicle for which it was intended.[3] Given this "good faith" requirement, Mr. Moore's denial of ownership

---

[3] The complete provision reads: "No person shall forge or counterfeit, make or have made, print or have printed, or have in his or her possession, any item or document which shall purport to be a certificate of title, temporary registration certificate, registration certificate, vehicle identification tag, or revalidation sticker or tab, unless the item was issued by the government of the District of Columbia, or federal, state, territorial, or foreign government (or a political subdivision of one of the foregoing) and is the genuine document or item intended to be issued. No person shall be liable

provided a reasonable basis for the officers to believe that searching the vehicle might turn up documentation proving that Mr. Moore's violation of 18 DCMR § 1104.4 was not in "good faith."

But the Government's victory on this point is futile, as its argument regarding the scope of the search strains credulity. According to the Government, the officers' search for documentation was "strictly limited to the areas where such documents might be found." Opp'n 9. Perhaps the Government could make that argument with a straight face if the officers had limited their search to the glove box and the center console or other areas where individuals store papers. But the officers' search extended well beyond that. They searched under the seats, in the seat back pockets, and under other items in the seats and footwells, including clothes and food wrappers. Suarez BWC 17:01:16–21, 54–02:34; Schemmel BWC 17:01:33–02:56, 03:06–40, 04:14–05:12, 07:09–08:22; Moore BWC 17:00:23–34, 01:08–03:31. They also looked under and behind a child car seat. Suarez BWC 17:02:22–31; Tr. 45:22–46:5. And they picked up a coffee cup to look in a cupholder. Schemmel BWC 17:06:25–40; Tr. 87:18–20. Basically, the officers looked in every part of the passenger compartment that they could see and access without physically taking the vehicle apart. This search was far from "strictly limited" as the Government claims. Opp'n 9. Indeed, it is hard to imagine a broader search than the one the officers conducted. Even the Government's own witness, Officer Suarez, testified that it is not his practice to look for documents in cupholders. Tr. 106:5-9. On this record, the Court concludes that the officers' warrantless search for documentation was unreasonably broad in violation of the Fourth Amendment. *Cf. Ross*, 456 U.S. at 824.

---

under this subsection when such items are in his or her possession under the good faith belief that the items or documents are genuine." 18 DCMR § 1104.4

*Search for Narcotics*. Mr. Moore similarly challenges the basis and scope of the officers' search for narcotics after they discovered MDMA on his person. He argues that under the circumstances, the discovery of eight MDMA pills did not provide a reasonable basis for the officers to believe that there would be more narcotics in the vehicle. Reply 9–10. The Court agrees.

Recall that courts consider the totality of circumstances in determining whether officers were justified in conducting a vehicle search incident to arrest. *Bailey*, 622 F.3d at 6. Specifically, the Government bears the burden of establishing specific and articulable facts which, taken together with rational inferences, would lead a reasonable officer to suspect that there might be relevant evidence in the vehicle. *Darwah*, 2026 WL 145612, at \*5, \*8.

The Government identifies only one fact supporting a belief that there might be evidence in the BMW: the officers' discovery of the MDMA in Mr. Moore's jacket pocket.[4] In the Government's view, that fact alone supported a "reasonable belief that there may be additional: (i) narcotics in the passenger compartment, which the defendant may have hidden when he was moving at the sight of the officers; or (ii) evidence in the car that would clarify whether the defendant possessed the pills on his person merely for personal consumption." Opp'n 9–10. But considering the totality of circumstances known to the officers, the Court cannot agree that the

---

[4] The probable cause report written after Mr. Moore's arrest states that Officer Schemmel saw "through the front windshield that [Mr.] Moore was erratically moving around in the driver seat of the vehicle." Suppl. Gerstein 1. The Government does not specifically rely on this statement in defending the search. Opp'n 9–10. But for the sake of completeness, the Court notes that it does not credit Officer Schemmel's statement, which is directly contradicted by officer statements on the body-worn camera footage regarding their difficulty seeing through the BMW's tinted windows, and by the body-worn camera footage itself which shows that it was nearly impossible to see through the tint from more than a few feet away. *See* Schemmel BWC 16:55:08–27 (showing how difficult it is to see through the front windshield from distance); Moore BWC 16:54:57–55:05 (same); Suarez BWC 16:54:46–57 (same for rear windshield and side windows).

discovery of the pills was sufficient to reasonably justify a belief that there would be further evidence of drug possession in the BMW.

Most significantly, when the officers discovered the MDMA, they had *already* thoroughly searched the passenger compartment of the vehicle top to bottom. *See generally* All BWCs 16:59:31–17:08:30. Yet the Government identifies nothing about that search that supported "a reasonable and articulable suspicion" that another search would uncover additional evidence of drug possession. *See Darwah*, 2026 WL 145612, at *8 (quoting *Delaney*, 955 F.3d at 1081). The officers searched in and under seats, in seat back pockets, in the glove box and center console, in the footwells, under a child car seat, in cupholders, and more. *See, e.g.*, Suarez BWC 17:01:16–21, 54–02:34; Schemmel BWC 17:01:33–02:56, 03:06–40, 04:14–05:12, 07:09–08:22; Moore BWC 17:00:23–34, 01:08–03:31. And yet they found no narcotics or even indicia that there were narcotics to be found in the vehicle. Tr. 100:10–16 (confirming that "nothing was found during that initial search"). They found no paraphernalia that might suggest narcotic use. *Id.* They found no bags, scales, or other materials that might suggest that Mr. Moore or any other recent occupant of the vehicle had been engaged in narcotic distribution. *Id.* They found no other peripheral indicators of narcotic-related activity—like a firearm or other weapon—that might indicate that Mr. Moore was prepared to protect himself from or carry out the sorts of violent activity often associated with drug distribution. *Id.* And the glass container that Officer Moore thought might contain PCP? Moore BWC 16:55:30–56:29. It turns out that it was just a bottle of cologne. Moore BWC 16:56:00–29; Tr. 74:3–5.

Courts frequently hold that officers have reasonable suspicion of illegal activity when they observe or otherwise sense the presence of contraband in a vehicle. *See, e.g.*, *New York v. Belton*, 453 U.S. 454, 455–56 (1981) (permitting vehicle search where officer "smelled burnt marihuana

and had seen on the floor of the car an envelope marked 'Supergold' that he associated with marihuana"); *United States v. Williams*, 878 F. Supp. 2d 190, 204 (D.D.C. 2012) (collecting cases applying the automobile exception and holding that the smell of narcotics coming from a vehicle is an objective factor that can support probable cause to search the vehicle); *United States v. Washington*, 670 F.3d 1321, 1323 (D.C. Cir. 2012) (officers had "objectively reasonable basis to search the car for evidence of [driving in possession of an open container of alcohol]" where there was a strong smell of alcohol coming from the car and a cup with a small amount of red liquid in plain view). Here, we have the opposite situation: the officers had already searched the passenger compartment thoroughly and discovered nothing. The Government has not articulated why, based on this prior search, the officers had any reason to suspect that they would find additional narcotics in the vehicle. *Cf. United States v. Holly*, 219 F. Supp. 2d 117, 126 (D.D.C. 2002) (finding no probable cause to search defendant's vehicle where there was "no information that the [vehicle] was used to keep or transport drugs or a firearm"); *see also United States v. Freeman*, No. 25-cr-127, ECF No. 45 at 43–44 (D.D.C. Sep. 22, 2025) (distinguishing *Washington*, 670 F.3d 1321, and finding that an open bottle in a bag in the defendant's vehicle did not support officers' reasonable suspicion to search the vehicle for additional alcohol absent signs of the defendant's intoxication).

But that is not the end of it—after all, the Court must consider "the totality of the circumstances." *Darwah*, 2026 WL 145612, at *10. And several other features of the officers' encounter with Mr. Moore undermine any suspicion that they would find evidence of drug possession in the BMW. For one, the possession of eight pills does not on its own provide a reasonable basis to conclude that Mr. Moore had a larger stash of drugs hidden away in the vehicle. *Contrast, e.g.*, *United States v. Wider*, 951 F.2d 1283, 1286 (D.C. Cir. 1991) ("Once the officers . . . became aware that [the defendant] possessed large quantities of crack, packaged for

19

distribution, . . . there was a fair probability that the vehicle contained additional evidence of drug dealing activity[.]") (internal quotations and citation omitted); *United States v. Belton*, No. 18-cr-246, 2019 WL 652412, at *2, *6 (D.D.C. Feb. 15, 2019) (finding that a search of the defendant's car incident to his arrest was lawful after officers found 36 bags of cocaine and heroin packaged for distribution on the defendant's person).

Nor does the Government claim that Mr. Moore's demeanor and behavior throughout his interactions with law enforcement suggested that he had drugs in the vehicle. Mr. Moore did not appear to be under the influence of any narcotics. Nor was he unduly nervous, agitated, or combative with the officers, which might have suggested that he had something to hide. *Contrast, e.g.*, *United States v. Washington*, 559 F.3d 573, 577 (D.C. Cir. 2009) (finding reasonable suspicion to search vehicle for weapons in part because the defendant was "extremely nervous, sweating excessively, and behaving oddly during the encounter—all of which suggested something was afoot"); *Thornton v. United States*, 541 U.S. 615, 618 (2004) (search of vehicle incident to arrest was lawful where, among other factors, driver "appeared nervous" and was "sweating," "rambling," and "licking his lips"). In fact, Officer Suarez testified at the evidentiary hearing that Mr. Moore was extremely cooperative throughout the whole interaction. Tr. 67:2–20.[5] And the officers did not observe Mr. Moore putting anything into the car during their interactions. *Contrast, e.g.*, *United States v. Christian*, 187 F.3d 663, 668 (D.C. Cir. 1999) (noting that officers

---

[5] Despite this testimony, Officer Suarez also referred at various points to his "Spidey senses go[ing] off"—first, because Mr. Moore stepped out of the vehicle, and later because he noticed that Mr. Moore's belt was undone. Tr. 21:17–21, 23:3–4. But it is well established that a "hunch" is an insufficient basis for reasonable suspicion. *United States v. Vinton*, 594 F.3d 14, 25 (D.C. Cir. 2010). And based on Officer Suarez's testimony at the evidentiary hearing, the Court concludes that his intuition about the situation was no more than a mere hunch.

"could reasonably be suspicious" of someone who, upon seeing police, "immediately throws something into a car" (cleaned up)).

Neither does the Government identify evidence that preexisted or was external to Mr. Moore's encounter with the officers that suggested that the BMW contained narcotics. Nothing in the record suggests, for example, that the officers had received a tip that Mr. Moore was involved with drug trafficking or distribution, that they had observed him engage in such activity, or that any of the officers on the Crime Suppression Team had previously investigated Mr. Moore or knew anything about him before the encounter at issue. *Contrast, e.g.*, *United States v. Garrett*, 959 F.2d 1005, 1006–07 (D.C. Cir. 1992) (officers had probable cause to search vehicle for narcotics where, among other things, they had received a tip that "narcotics were being distributed" in a "high narcotic area" by someone driving a car that matched the defendant's car); *United States v. Sheffield*, 799 F. Supp. 2d 22, 32 (D.D.C. 2011) ("officers' prior information about [the defendant's] involvement with illegal narcotics trafficking," combined with other factors, provided probable cause to search the defendant's vehicle). Nor is there record evidence suggesting that the area where Mr. Moore was stopped by police was known for drug use or distribution. *Contrast, e.g.*, *Garrett*, 959 F.2d at 1006–07; *United States v. Brown*, 334 F.3d 1161, 1165 (D.C. Cir. 2003) (reasonable suspicion to stop the defendant and search his car was in part supported by the fact that he was parked in "a neighborhood known for 'a lot of drug activity'" and where there had been recent gun violence).

Taken together, these facts all contradict the Government's contention that the officers had a reasonable basis to believe that they would find additional narcotics or other evidence in the vehicle. Considering the totality of circumstances "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," *Bailey*, 622 F.3d at 6, the Court

21

cannot conclude that the officers had an articulable basis to believe that they would find evidence of narcotics possession in the vehicle.

In arguing otherwise, the Government cites a single case: *United States v. Vinton*, 594 F.3d 14 (D.C. Cir. 2010). But *Vinton* does not get the Government where it needs to go. In *Vinton*, an officer initiated a traffic stop after observing a vehicle speeding with "excessively tinted" windows. *Id*. at 18. Immediately after pulling the vehicle over, the officer "saw a knife with a five-and-a-half-inch sheath on Vinton's backseat, in close proximity to Vinton, easily within reaching-distance." *Id*. "Vinton explained the knife was used when fishing with his grandfather, but [the officer] saw no other fishing equipment in the car." *Id*. Another officer appeared on scene and informed the first officer that "there had been a double-stabbing homicide in the same vicinity approximately twenty hours earlier." *Id*. When the first officer asked Mr. Vinton if there were weapons in the car, he eventually said, "not that I know of." *Id*. But during a protective sweep of the car, the officer found "two cans of mace in the front armrest, a butterfly knife under the front passenger-side floor mat, a bag of Styrofoam earplugs, and a locked briefcase on the backseat." *Id*. at 19 (cleaned up). The officer placed Mr. Vinton under arrest for possession of a prohibited weapon (the butterfly knife), and then opened the locked briefcase to find "three bags of ecstasy, three pistol magazines, a fighting knife like brass knuckles, and a .45 caliber semiautomatic pistol, cocked and loaded." *Id*. (cleaned up).

In upholding the search of the locked briefcase as a search incident to arrest, the D.C. Circuit found that the officer "was reasonable in expecting there might be additional weapons" because he had already found (1) "*two* knives, one of which was hidden"; (2) "two cans of mace"; and (3) "a bag of earplugs," which "are commonly used at firing ranges to muffle the noise from guns." *Id*. at 26.

It should be obvious that *Vinton* is nothing like this case. The officers here conducted a sweeping (and unconstitutional) search of the vehicle before finding MDMA in Mr. Moore's pocket. The Government does not contend that the search yielded any evidence suggesting that Mr. Moore may have hidden additional narcotics in the vehicle. Nor, as discussed, has the Government pointed to any evidence other than the MDMA discovered on Mr. Moore's person to support that there might have been narcotics in the vehicle. *See* Opp'n 9–10. In other words, the officers here had no leads like the officers in *Vinton* that would support a reasonable suspicion that they would find additional evidence of the crime for which they arrested Mr. Moore.

The Government seems to suggest that *Vinton* supports a bright-line rule in narcotics possession cases: that if officers discover any narcotics on a person, the officers may always search the person's car incident to arrest. *See* Opp'n 10. The Court is not convinced. Most obviously, *Vinton* is a firearms case, so it could not have created a bright-line rule for narcotics possession cases. And while one passage in *Vinton* appears to suggest that arrests for "possession of narcotics" may justify a vehicle search, 594 F.3d at 26, the opinion as a whole does not indicate that "bright-line" rules should guide a court's analysis in this area.[6] On the contrary, *Vinton* "admonished that a search incident to arrest under *Gant*'s evidentiary rationale likely requires the same reasonable suspicion that would justify a *Terry* search." *Darwah*, 2026 WL 145612, at *10 (citing *Vinton*, 594 F.3d at 25). Indeed, adopting the bright-line rule that seems to follow from the Government's position would run afoul of "[b]inding Supreme Court and D.C. Circuit precedent requir[ing] reasonable suspicion to be based on the totality of the circumstances, including the specific,

---

[6] At least one other court in this District has also noted that "the language referencing narcotics possession" in *Vinton* is "dictum because it was 'not necessary to [the] court's holding,'" and "dictum is not binding circuit precedent." *Darwah*, 2026 WL 145612, at *10 (quoting first *In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019); and then *Jam v. Int'l Fin. Corp.*, 3 F.4th 405, 409-10 (D.C. Cir. 2021)).

articulable facts 'available to the officer at the moment of the [search].'" *Id.* (quoting *United States v. Castle*, 825 F.3d 625, 635 (D.C. Cir. 2016)). The Court thus declines to adopt such a rule. *Cf. Gant*, 556 U.S. at 345 ("A rule that gives police the power" to search an arrestee's vehicle even "when there is no basis for believing evidence of the offense might be found in the vehicle, creates a serious and recurring threat to the privacy of countless individuals.").

The Supreme Court cases on which *Vinton* relies—*New York v. Belton* and *Thornton v. United States*—reinforce why the Government is wrong in this case. Those cases present more robust factual circumstances supporting a warrantless vehicle search. In *Belton*, a policeman arrested four men in a vehicle that he had pulled over for speeding after he "smelled burnt marihuana" and saw an envelope on the floor of the car "marked 'Supergold' that he associated with marihuana." 453 U.S. at 455–56. After arresting the men, the officer searched the passenger compartment of the vehicle and found cocaine in the pocket of a jacket on the backseat. *Id*. at 456. The Supreme Court found that the warrantless search of the vehicle and jacket was a lawful search incident to arrest. *Id*. at 462–63. And in *Thornton*, the Supreme Court found that a vehicle search incident to arrest was lawful when a driver who had gotten out of his vehicle "appeared nervous"; was "sweating," "rambling," and "licking his lips"; and when patted down by an officer and asked if he had illegal narcotics, pulled out "three bags of marijuana" and another bag with a "large amount of crack cocaine." 541 U.S. at 618.

At bottom, these cases do not support the Government's sweeping position. All three involved facts—absent here—that supported a reasonable belief that further evidence would be found in the vehicle. Here, by contrast, the Government points to a small amount of narcotics in Mr. Moore's pocket. This is not to say that the discovery of narcotics on an occupant of a vehicle is meaningless when evaluating the lawfulness of a search. But here, it is the *only* fact that the

Government relies on in defending the search. Considering all the circumstances in this case, that fact alone does not carry the Government's burden of articulating a reasonable basis for the officers to suspect that they would find further evidence in the BMW. Indeed, the Government has not identified another case upholding a search incident to arrest on such a thin record.

Accordingly, the Court concludes that the officers did not have a reasonable basis to search the vehicle after the discovery of MDMA on Mr. Moore's person. Thus, the Court must suppress the firearm that the search produced.

### 2.    The Automobile Exception

The Government argues in the alternative that the "automobile exception" to the warrant requirement applies to the searches. Opp'n 10–11. That argument fails, too. The automobile exception permits law enforcement to search a vehicle only if "*probable cause* exists to believe it contains contraband." *Williams*, 773 F.3d at 105 (emphasis added). Probable cause is a higher standard than the "reasonable suspicion" standard applicable to vehicle searches incident to arrest. *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001). Thus, having flunked the reasonable suspicion analysis, the Government cannot meet its burden of establishing probable cause.

\*    \*    \*

For these reasons, the Court must suppress the firearm discovered during the officers' vehicle search incident to arrest. In doing so, the Court observes that according to the Government's own witness, this entire case began with six officers serving in a so-called "Crime Suppression Unit" descending upon a vehicle because of activity (*i.e.*, idling) that is not illegal, much less criminal. That mistake of law, and the officers' subsequent identification of legitimate but minor traffic infractions, prompted them to rapidly surround the vehicle, seize its occupant, and place him in handcuffs, all without any indication that Mr. Moore posed any threat to them or

was at all unwilling to answer their questions or comply with their directions. They then proceeded to search the vehicle, including everything within sight in the interior—not once, but twice—in violation of the Fourth Amendment. These actions cannot be sustained. The Court thus grants Mr. Moore's motion to suppress the firearm ultimately recovered from the vehicle.[7]

## CONCLUSION

For all the above reasons, the Court grants Mr. Moore's Motion to Suppress Physical Evidence, ECF No. 13. A separate order will issue.

_____
SPARKLE L. SOOKNANAN
United States District Judge

Date:    June 24, 2026

_____

[7] Because the search that uncovered the firearm was illegal, the Court need not reach Mr. Moore's other arguments in favor of suppression, including the argument that any earlier Fourth Amendment violations tainted the search that uncovered the firearm. In fact, that argument went unanswered by the Government in its briefing. Opp'n 11–12. The Government raised its opposition to Mr. Moore's argument for the first time at the conclusion of the evidentiary hearing, which was more than three months after briefing closed. *See* Tr. 115:20-116:16 (the Government conceding that its opposition brief did not respond to Mr. Moore's argument that the alleged Fourth Amendment violations tainted everything that followed, including the discovery of the gun); *see also id.* 115:16-18 ("[I]n our brief, our contention was that those searches were not illegal."). Such "sandbagging" at best risks wasting the Court's and the Parties' time and resources. *See U.S. ex rel. Davis v. D.C.*, 793 F.3d 120, 127 (D.C. Cir. 2015) ("Generally, arguments raised for the first time at oral argument are forfeited."). At worst, it is highly prejudicial to Mr. Moore who might have approached the evidentiary hearing very differently. When asked to brief why the Court should consider the Government's belated argument, the Government notes that "other judges in this district have permitted the United States to raise supplemental arguments that were not contained in an initial opposition to a defendant's motion to suppress." ECF No. 33, at 3. But as shown by the cases cited by Mr. Moore, the Government collects only the cases that it favors and ignores others that point in the other direction. ECF No. 34, at 1–2. Ultimately, the Court need not reach the question of forfeiture given its conclusion that the firearm must be suppressed for other reasons. But it notes that the Government's argument—which amounts to an acknowledgment that the Government wants a do-over of its opposition brief because it was not thorough enough the first time—does not impress the Court. The Court reminds the Government that *it* bears the burden of establishing the lawfulness of the relevant searches in this case. Waiting until deadlines have long passed to make arguments prejudices the Defendant and wastes the Court's time.